**Dawn Michelle MAYES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–98–0131–CR.**

Court of Appeals of Texas, Amarillo.

Nov. 16, 1999.

J. Rex Barnett, Attorney at Law, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Michael R. Casillas, Asst. Crim. Dist. Attys., Fort Worth, for appellee.

Before QUINN and REAVIS and JOHNSON, JJ.

BRIAN QUINN, Justice.

Dawn Michelle Mayes appeals her conviction for aggravated sexual assault. Raising two points of error, she questions the admission of her written confession into evidence and the effectiveness of her counsel. We reverse.

### Background

Appellant was indicted for committing aggravated sexual assault upon her six year old daughter, T.M. According to the child, appellant's live-in boyfriend, Lee, performed oral sex on her and caused her to masturbate him and to perform oral sex on him. T.M. further stated that appellant was present during these sexual exploits, that she could see what was happening, and that she had earlier instructed T.M. on how to masturbate Lee and perform fellatio on him.

Following an investigation into T. M.'s allegations, members of the Grapevine Police Department procured an arrest warrant and arrested appellant. The latter was then transported to the police station, informed of her *Miranda* rights, and interrogated by two detectives.

At the beginning of the interrogation, which was videotaped, appellant stated that she did not know if she wanted to talk to the police. Having said this, however, she began speaking to the officers. Appellant spent approximately 30 minutes telling them that she believed she was being framed by a friend and that neither she nor her boyfriend did anything wrong to T.M. The officers gradually became more confrontational and informed appellant of her need to tell the truth. As one officer was so admonishing her, appellant interrupted and said "I'm going to stop talking." Despite this pronouncement, the officer continued with his comments and questions. About four minutes later, appellant again declared "I'm going to shut up. I'm not going to say another

goddamned thing." Yet, as before, the detectives neither paused nor ended the proceeding. Rather, they continued as if uninterrupted.

Soon, appellant became increasingly subdued as the officers impressed upon her the need to be truthful. This eventually lead to the following exchange:

Appellant: Well, first of all, you all going [sic] to have to let—some way where I can talk to Lee so I can get some phone numbers so I can get ahold of somebody so I can get us a lawyer.

Detective: So that means you're not going to talk to us?

Appellant: I don't know what I'm going to do. I need to talk to Lee so I can get some phone numbers so I have them for me.

\* \* \*

Detective: Now if you want to talk to a lawyer you can talk to a lawyer.

Appellant: *Well I have to get one for both of us.*

Detective: Well you won't be talking to Lee. We're gonna be talking to Lee and we're gonna be talking to a whole lot of other people in this investigation and we're gonna get some statements on what happened. If you don't want to give a statement then you just say so because we're doing this for your opportunity because your little girl has accused you and two other people of sexually abusing her. And if you think its just going to go away because you say it didn't happen, then you are wrong. It's not gonna go away. *Now if you need some help along those lines, you better get it, and this is the place to start right here. Right here, right now, telling the truth about what happened at that house on Easy Street.* This will not go away just because you say it didn't happen. It's not going to go away. When this interview is over, you're

going to jail. You're on a $50,000 bond and when you leave here you'll go to Tarrant County jail until you can post a bond. And we won't be coming and asking you to tell the truth any more after this. We're gonna ask some other people. So if you want to tell your version of what happened then tell it right here, right now. But don't come back later and say 'oh they—they wouldn't let me have a chance to talk about it,' because this is your chance. But don't tell on us like Michelle Patterson didn't give you the opportunity because we're giving you opportunity. But we want to hear the truth and we need to hear the truth. For Tiffany's sake."

(emphasis added)

Thereafter, appellant admitted to being present when Lee and another man sexually assaulted T.M. and to putting her tongue against T. M.'s vagina. The detectives then asked appellant if she would "give a written statement of all the things we've just discussed." One encouraged her to do so by stating that "you're not going to be doing more than what you've done already." Appellant acquiesced, and her written confession was subsequently admitted into evidence.

### Point of Error One—The Motion to Suppress Appellant's Statement

Appellant contends that the court erred in denying her motion to suppress her written confession because it was taken in violation of her right against self-incrimination under the Fifth Amendment to the United States Constitution. We agree.

#### a. Standard of Review

■■■■ We review *de novo* a trial court's ruling on a motion to suppress if that ruling simply involved an application of law to undisputed fact. *Maestas v. State,* 987 S.W.2d 59, 62 (Tex.Crim.App.1999) *cert. denied* — U.S. ——, 120 S.Ct. 93, 145

L.Ed.2d 79, 1999 U.S. Lexis 5247 (1999); *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim.App.1997). Here, credibility and demeanor were not issues, as the facts surrounding the interrogation were preserved on videotape and completely uncontroverted. In effect, we are being asked to merely apply the law to uncontroverted fact, which, in turn, enables us to review *de novo* the trial court's decision.

■■■■ Next, it is axiomatic that prior to a custodial interrogation, one must be advised, among other things, that he has a right to remain silent, *Miranda v. Arizona,* 384 U.S. 436, 467–68, 86 S.Ct. 1602, 1624–25, 16 L.Ed.2d 694, 720 (1966) and to consult with an attorney. *Id.* at 471, 86 S.Ct. at 1602, 16 L.Ed.2d at 722. Similarly well settled is that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 86 S.Ct. at 1626–27, 16 L.Ed.2d at 723. As has long been acknowledged, the invocation of that right by the suspect must be " 'scrupulously honored.' " *Maestas v. State,* 987 S.W.2d at 61–62, *quoting, Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). This does not mean that no further questioning can ever occur, but rather that there must be an end to the proceeding sufficient to indicate that the police respected the suspect's request. *Id.* And, whether such an end occurred depends upon 1) whether the suspect was informed of his right to remain silent prior to the initial questioning, 2) whether the suspect was informed of his right to remain silent prior to the subsequent questioning, 3) the length of time between the initial and subsequent questioning, 4) whether the subsequent questioning focused on a different crime, and 5) whether the police honored the suspect's request for silence. *Id.* at 62. Yet, we need not consider any of these factors if the suspect's comments did not clearly manifest his desire to remain silent. *Dowthitt v. State,* 931 S.W.2d 244, 257 (Tex.Crim.App.1996). This is so because

anything less than a clear manifestation does not obligate the officer to stop the interrogation. *Id.; see Cooper v. State,* 961 S.W.2d 222, 226 (Tex.App.—Houston [1st Dist.] 1997, pet. ref'd) (holding that one's declaring " 'I'm not answering any questions' " sufficiently manifested an intention to remain silent).

■■■ Similarly, interrogation must immediately cease if the suspect states "that he wants an attorney. . . ." *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723; *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 386 (1981); *Dinkins v. State,* 894 S.W.2d 330, 350 (Tex.Crim. App.), *cert. denied,* 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995). And, like the invocation of the right to remain silent, the request for counsel must also be clear and unambiguous. *Davis v. United States,* 512 U.S. 452, 460–61, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 372 (1994); *Dinkins v. State,* 894 S.W.2d at 350–51. In other words, the totality of circumstances inherent in the case must illustrate that the suspect *"actually* invoke[d] his right." *Dinkins v. State,* 894 S.W.2d at 351. And, whether he did depends upon whether the "suspect express[ed] a definite desire to speak to someone, and that person be an attorney." *Id.* at 352. For instance, comments like "I can't say more than that[,] I need to rest" and " '[m]aybe I should talk to a lawyer,' " have been found to be too ambiguous. *Dowthitt v. State,* 931 S.W.2d at 257; *Davis v. United States,* 512 U.S. at 455, 114 S.Ct. at 2355, 129 L.Ed.2d at 368. On the other hand, the suspect uttering that he was " 'not doing any [field sobriety] tests' " when coupled with " 'you are trying to incriminate me and without an attorney' " do exemplify a desire for legal counsel. *Stanton v. State,* 953 S.W.2d 832, 834–35 (Tex.App.—Amarillo 1997, no pet.).

 *b. Application of Standard*

  *i. Right to Silence*

■■■ The first point at which appellant supposedly tried to terminate her interrogation was just after the officers Mirandized her. Initially, she stated that she did not know if she wanted to talk. Having said that and before the officers asked a question, she then launched into a denial of wrongdoing. By stating that she did not know if she wanted to talk, appellant, at best, expressed ambivalence toward waiving her rights. But, by following that statement with more speech, separated by little more than a breath, it is clear she resolved her dilemma; in short, she wanted to talk. Thus, we do not find this initial comment of appellant to be an unambiguous assertion of the right to remain silent. Nevertheless, the same cannot be said of several of her later utterances.

■■■ Approximately six minutes after the foregoing occurred, appellant stated "I'm going to stop talking." Several minutes later, she reiterated, "I'm going to shut up. I'm not going to say another goddamned thing." Several more minutes lapsed when appellant stated for the third time "I'm not talking." Unlike the comment addressed above, these do not reflect equivocation or ambiguity. Not only were they certain, but they also clearly expressed her desire to stop talking. Moreover, appellant did not proceed into another diatribe immediately after making the statements. Rather, in each case, her comments were followed by the detectives either admonishing her about her need to reveal the identity of the guilty parties or the substance of the incident. And, at those times when their admonishments were followed by her silence, they stressed upon her the need to speak "for the sake of" T.M. In short, appellant's statements evinced an unequivocal declaration of her desire to halt further comment which, in turn, obligated the officers to end their interrogation. Because they did not stop, they transgressed constitutional dictate.

■■■ We reject the State's argument that no violation occurred because 1) appellant resumed speaking after the officers pressed upon her the need to talk, and 2) their comments took the form of state-

ments as opposed to questions. As to the former, after she invoked her right to silence, the officers continued their interrogation without again Mirandizing her. Furthermore, they allowed merely seconds, at most, to pass before resuming their quest to induce her to speak. And, at those times when their attempts were met with silence, they again began to urge her to speak. Lastly, the interrogation which ensued, more often than not, encompassed the very incident for which she was arrested as opposed to some other crime. Consideration of this evidence in the framework suggested by *Maestas* leads us to conclude that the officers simply ignored appellant's statements that she no longer cared to speak. Simply put, "[a] law enforcement officer may not continue to question the suspect until the officer succeeds in persuading the suspect to change [her] mind and talk," *Dowthitt v. State*, 931 S.W.2d at 257, and then claim she waived her right to silence because he succeeded in making the suspect talk again.

Nor can it be said that by uttering declaratory, as opposed to interrogatory, statements to appellant the officers actions constituted something other than interrogation. Regardless of the tenor of their words, the officers were pressing her for information about the crime and those involved. Given this purpose, the form their words took was unimportant.

■ For similar reason, we also reject the State's argument that she waived her right to remain silent because she subsequently executed a written confession after again being Mirandized. This is so because there was no substantive attenuation between the violation of her rights and the officers' request that she sign the document. Indeed, the detectives themselves undoubtedly thought as much when one told her that "you're not going to be doing more than what you've done already" to induce her to execute the confession. Under these circumstances, further Mirandizing appellant meant nothing since "[t]he

more times police inform a suspect of his rights in the face of his repeated invocation of one of those rights ... the clearer it becomes that the police must not mean what they say." *United States v. Hernandez*, 574 F.2d 1362, 1369 (5th Cir.1978).

In sum, we conclude that the officers denied appellant her right to remain silent. This tainted not only her verbal confession but her written one as well. Consequently, the trial court erred in rejecting appellant's motion to suppress.

#### ii. Right to Counsel

■ In addition to her attempts to terminate the interrogation, appellant also attempted to invoke her right to counsel. In response to repeated entreaties to "tell the truth," appellant stated that she wanted to talk with Lee to get some telephone numbers for a lawyer. The State argues, quite correctly, that this request was ambiguous and did not require the detectives to discontinue the interrogation. *See Davis v. United States*, 512 U.S. at 455, 114 S.Ct. at 2355, 129 L.Ed.2d at 368 (suspect stating " '[m]aybe I should talk to a lawyer' " held too equivocal to require cessation of interrogation); *Dowthitt v. State*, 931 S.W.2d at 257 (police officer is not required to seek clarification of ambiguous assertion of rights). However, appellant's attempt to seek counsel did not end there.

After stating that she wished to get some telephone numbers from Lee, one of the detectives stated, "Now if you want to talk to a lawyer you can talk to a lawyer." Appellant replied that she had "to get one for both of us." Then she was told that she could not speak with Lee, that they were affording her the opportunity to tell her side of the story, that the case was not going to go away simply because she denied the allegations, and that

> "[n]ow, if you need some help along those lines, you better get it, and this is the place to start right here. Right here, right now, telling the truth about what happened at that house on Easy Street."

■ We hold that the statement that "I have to get one for both of us" was an unambiguous assertion by appellant of her right to counsel. The fact that she wished to procure counsel for her co-defendant does not diminish the fact that she expressly desired counsel for herself. The context of the exchange made her assertion quite clear; the detective told appellant she could speak to a lawyer if she wished to and she responded that she had to "get one." Unlike the suspect in *Davis* who said "maybe" he needed a lawyer, or the defendant in *Granberry v. State*, 745 S.W.2d 34, 36 (Tex.App.—Houston [14th Dist.] 1987, pet. ref'd), who wished to speak to his father about getting an attorney, appellant said "I have to get" an attorney. In sum, appellant's comments illustrated not only a "definite desire to speak to someone, [but also] that the person be an attorney." *Dinkins v. State*, 894 S.W.2d at 352.

■ Additionally, by continuing their interrogation in the face of appellant's declaration, the police were doing nothing short of " 'badgering a defendant into waiving ... previously asserted *Miranda* rights.' " *Davis v. United States*, 512 U.S. at 458, 114 S.Ct. at 2355, 129 L.Ed.2d at 371 (quoting *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293, 302 (1990)). Rather than do that, they were constitutionally bound to cease their efforts to persuade her to talk. So too were they obligated to forego resuming discussion about the crime until counsel was provided or she re-initiated the dialogue. *Dinkins v. State*, 894 S.W.2d at 350. Again, an interrogator cannot continue his questioning and then claim waiver because he succeeded in having the individual "respond[ ] to ... further police-initiated custodial interrogation." *Edwards v. Arizona*, 451 U.S. at 484, 101 S.Ct. at 1885, 68 L.Ed.2d at 386.

We also reject the State's contention that appellant waived her right to counsel because she subsequently signed a written confession after again being Mirandized. We do so for the same reasons we did *vis-a-vis* its argument concerning waiver of appellant's right to remain silent. Simply put, execution of the confession followed on the heels of the unlawful interrogation. The latter directly spawned the former, without any intervening period sufficient to remove the taint arising from the officer's misconduct.

In sum, we hold that appellant invoked her right to counsel. Because the police did not honor her right, the ensuing written confession was tainted and subject to suppression. Because it was not suppressed, the trial court erred.

### c. Harm Analysis

■ The error found above encompasses the violation of appellant's rights under the United States Constitution. In assessing the harm emanating from such error, we utilize the standard contained in Texas Rule of Appellate Procedure 44.2(a). The latter obligates us to reverse the judgment unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex.R.App. P. 44.2(a).

■ Next, since Rule 44.2(a) is simply a reiteration of the old Rule 81(b)(2), *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim.App.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999), precedent construing the latter is still helpful in making the assessment. That precedent instructs us to analyze the source and nature of the error, whether or to what extent the error was emphasized by the State, its probable collateral implications, the weight a juror would probably place upon the error, and the likelihood that declaring the error harmless would encourage the State to repeat it with impunity. *Harris v. State*, 790 S.W.2d 568, 587–88 (Tex.Crim.App.1989). And, while the quantum of admissible evidence indicative of guilt is a factor which may also be considered, it is not the primary focus. Rather, we consider each indicia to decide if the error in question was of such magni-

tude as to disrupt the jurors' orderly evaluation of that evidence. *Id.*

Here, the State emphasized the confession during its case-in-chief as well as its closing argument. Indeed, at closing, the prosecutor stressed the impact of the document by arguing that

> the way you know that she is guilty as a primary actor[ ] is by looking *at her statement.* And her statement is in evidence. If you want to see it, if you need to see it again, you can see it again.

(Emphasis added). Additionally, the evidence of appellant's guilt as a "primary actor" (as opposed to a party) was rather weak without her confession.[1] And, given that the document consisted of appellant's *own* words, rather than the potential misperceptions of a third party, it is quite difficult to say that rational jurors would have assigned little weight to it in assessing her guilt as either a primary actor or party.

More importantly, the clarity with which appellant invoked her rights to silence and counsel, the impunity with which the detectives proceeded with their interrogation, and the tenuous argument proffered by the State that a suspect can be said to have waived invocation of those rights simply by having the interrogators continue to interrogate, suggests that holding the misconduct at bar harmless would be to invite further misconduct.

Upon testing the evidence against the factors alluded to in *Harris,* we cannot say, beyond reasonable doubt, that the error at bar did not contribute to appellant's conviction. Thus, we must conclude that it was harmful.

Admittedly, heinous crimes such as that before us merit aggressive investigation and prosecution. Yet, constitutional mandate exists to curb aggressive effort that exceeds lawful parameters. That some

may think those parameters favor the guilty is little price for assuring that they protect the innocent. Accordingly, we sustain appellant's first point of error and reverse and remand the cause for further proceeding.[2]

---

1. The charge afforded the jury asked it to determine whether appellant was guilty of sexual assault either as a primary actor or as a party to an assault by Lee.

2. Our resolution of the first point relieves us from having to address appellant's second point.